IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u> MICHAEL J. SHANK, | ) ) ) ) |
| STATE OF ILLINOIS <u>ex rel.</u> MICHAEL J. SHANK, | ) ) ) ) |
| Plaintiffs, | ) ) Civil No. 04-cv-4105-JPG |
| v. | ) ) ) |
| LEWIS ENTERPRISES, INC., an Illinois corporation; DAVID M. LEWIS, individually; JOE JOE JOHNSON; DANNY JOHNSON; ANDY WOODS; and MIKE BROWN, | ) ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Lewis Enterprises, Inc. ("Lewis Enterprises") and David M. Lewis' ("Lewis") Motion to Dismiss or in the Alternative Motion for a More Definite Statement (Doc. 33), to which relator Michael J. Shank ("Shank") has responded (Doc. 36). In their motion, defendants claim Counts I, II and III of Shank's complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). In the alternative, they request a more detailed statement of the facts. For the following reasons, defendants' motion will be **DENIED**.

**BACKGROUND**

   A.   **Shank's Employment with Lewis Enterprises**

Shank brought this suit against Lewis, Lewis Enterprises and several of its former employees on behalf of the United States and the State of Illinois pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1) ("FCA"), the Illinois Whistleblower Reward and Protection Act, 740 ILCS § 175/4(b)

1

and the Insurance Claims Fraud Prevention Act, 740 ILCS § 92/15(a). Shank, a former employee of Lewis Enterprises, allegedly witnessed defendants engage in a variety of illegal activities, including the fraudulent billing of benefit plans serving retired miners.

Lewis, a licensed audiologist, is the controlling owner of Lewis Enterprises, an audiology firm based in West Frankfort, Illinois. Lewis Enterprises provides a variety of hearing-related services at its nine retail locations in Southern Illinois; apparently, its business focuses on the fitting, selling and servicing of hearing aids. Lewis Enterprises hired Shank as a field representative in August 2000; primarily, his duties consisted of finding new clients and selling them hearing aids.[1] He would attract clients by informing them that Lewis Enterprises offered free hearing tests. If an individual was interested, Shank would perform an audiogram – a test to determine one's hearing loss – advise him of his need for a hearing aid and then pitch Lewis Enterprises' goods and services. Importantly, Shank was not licensed to administer audiograms, and his administration of that test was in violation of Illinois law. At a meeting between the two in late March 2001, Lewis directed Shank to solicit business from retired coal miners in Southern Illinois. At this meeting, Lewis produced a large three-ring binder containing the contact information of retired coal miners in the area ("List") – each page of the List contained twenty to thirty names. Shank took a portion of the List and contacted the individuals listed to inform them that Lewis Enterprises provided free hearing tests and that their insurance carrier would pay for hearing aids if they were needed. Importantly, Lewis Enterprises billed the miners' insurance carriers for the hearing tests anyway. Shank was able to persuade a number of coal miners to do business with Lewis Enterprises – from March 2001 to November 2002,

---

[1]Before he began working for Lewis Enterprises, Shank obtained a license to dispense hearing aids.

Shank provided services to approximately 140 retired miners.

When Shank met with the miners (and other potential clients), he would obtain their insurance cards and other relevant information, relay it to Lewis Enterpirses' West Frankfort office and then conduct a hearing test. If he made a sale after conducting the test, he would fill out a Confidential Case History form (detailing the results of the audiogram, among other things) and submit it to the office. After making approximately six or seven sales to retired miners, Lewis told Shank he needed to get prescriptions for the hearing aids that he sold so that Lewis Enterprises could be reimbursed for the hearing tests and aids. Lewis' directed Shank to get hearing *aids* so that Lewis Enterprises could sell, and eventually obtain reimbursement for, more than one aid. As Shank had not obtained prescriptions from his initial clients, he called these individuals and, at his request, they successfully obtained prescriptions for hearing aids from their physicians. Over time, however, Shank was not able to obtain prescriptions for all of his clients. Lewis had advised Shank of this possibility and told him to submit the information of a patient for whom he could not obtain a prescription to the West Frankfort office so that an employee there could "take care of it." (Doc. 1 at ¶ 62). When Shank did this, the patient always received a prescription from a doctor – one that never examined the patient. Though Shank does not include the names of the clients he serviced while with Lewis Enterprises in the complaint, he does identify 7 patients by number, the date they received services and the coal mine for which each individual worked.

During the summer of 2001, Shank began receiving the Confidential Case History forms he completed and submitted back from Lewis Enterprises. These forms had been changed and no longer indicated that Shank had performed the audiograms; instead, they indicated that Lewis had done them. In May 2002, Shank observed approximately 35 audiogram reports on Lewis' desk that were

performed by other employees who were not licensed to do so – defendants Joe Joe Johnson, Danny Johnson and Andy Woods. Shank noticed that Lewis had rewritten, or was in the process of rewriting these forms, to indicate that he had performed the audiograms. Some of these forms were from coal miners.

### B.     The Coal Act

The mostly unwilling (though sometimes willing) third parties to defendants' (and Shank's) activities were retired coal miners. This fact is important here because their health benefit plans implicate a series of national collective bargaining agreements between the United Mine Workers of America ("Union") and the Bituminous Coal Operator's Association ("BCOA"). The Union and the BCOA entered into the first of these collective bargaining agreements – called the National Bituminous Coal Wage Agreements ("NBCWAs") – in 1947. Over the years, the Union and BCOA entered into a number of these agreements with varying success. By the early Nineties, the Benefit Plans established pursuant to the various iterations of the NBCWA were experiencing significant financial difficulties. As a result, Congress passed the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701, *et seq*. The Coal Act significantly restructured the financing of miners' health benefits, and created a new, tripartite benefit scheme. First, it combined the benefit funds created by the 1950 and 1974 NBCWAs into one fund, the Combined Benefit Fund ("Combined Fund"). This fund provides benefits to those workers who were eligible to receive benefits under the 1950 and 1974 plans when the Coal Act took effect. *See* 26 U.S.C. § 9702(a)(2). Second, the Act required those employers who had established individual employer plans ("IEPs") pursuant to the 1978 NBCWA and subsequent agreements to maintain their coverage for those retirees then receiving benefits and those qualifying retirees who retired before September 30, 1994.

*See* 26 U.S.C. § 9711(a). Finally, the Coal Act established the UMWA 1992 Benefit Plan ("1992 Plan") to provide coverage to (1) any individual retiring before September 30, 1994, who "but for the enactment of the [Coal Act] would be eligible to receive benefits from the [1950 or 1974 Plans], based upon age and service earned as of February 1, 1993," 26 U.S.C. § 9712(b)(2)(A), and to (2) any individual retiring before September 30, 1994, "with respect to whom coverage is required to be provided [by an individual employer plan], but who does not receive such coverage from applicable last signatory operator . . . ." 26 U.S.C. § 9712(b)(2)(B).

    **C.**    **Hearing Aid Funding**

The source of funding for these three plans is of critical importance here. Shank included the following allegations on this issue:

> Funding for the Combined Fund is obtained from coal operator premiums and appropriations from the United States Office of Surface Mining's Abandoned Mine Reclamation Fund. 26 U.S.C. § 9704; 30 U.S.C. § 1232(h). Funding of the 1992 Plan is obtained from coal operator premiums. 26 U.S.C. § 9712. Funding under the Coal Act has been found to constitute a tax and, under the administration of the Coal Act, constitutes federal funds.
>
> Furthermore, since 1990, the Combined Fund and the 1992 Plan (collectively the "Coal Act Plans") have jointly participated in a Medicare demonstration project with the Centers for Medicare and Medicaid Services. Through this demonstration project, the Coal Act Plans process both Part A and Part B Medicare claims for plan beneficiaries who are enrolled in Medicare.
>
> In regard to Part A Medicare claims, the Coal Act Plans receive a yearly payment from CMS equal to a target expenditure amount. Any amounts required to be paid by the Coal Act Plans for Medicare claims beyond that target expenditure amount are shared by the Coal Act Plans and CMS. Any amounts remaining in a benefit year are split between the Coal Act Plans and CMS.
>
> In regard to Part B Medicare claims, the Coal Act Plans receive a yearly per beneficiary payment from CMS. Any amounts required to be paid by the Coal Act Plans for Medicare Part B claims beyond that beneficiary premium amount are the sole responsibility of the Coal Act Plans. Any amounts remaining in a benefit year are retained by the Coal Act Plans and used for the administration of the Coal Act

>     Plans' benefits.
>
>     . . . .
>
>     Illinois Medicaid also provides reimbursement for hearing aids.
>
>     Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program, in accordance with Title XIX of the Social Security Act, as amended, 42 U.S.C. § 1396 *et seq*. The Federal Government grants funds to the individual states for Medical Assistance Programs to furnish medical assistance to families with dependent children and to aged, blind, or disabled individuals whose income and resources are insufficient to meet the costs of necessary medical services. The benefits paid by the individual state agencies contain a certain percentage of federal funds. *Id*.
>
>     In Illinois, the percentage of federal funds involved in the Medicaid program during the relevant time period has been fifty percent (50%).
>
>     . . . .
>
>     The United States, unaware of the falsity of the records, statements, or claims made or caused to be made by [defendants] paid for claims through the Coal Act plans that would otherwise not have been allowed or would have been reduced.

(Doc. 1 at ¶¶ 32-35, 43-45, 77) (¶ 77 is functionally identical to ¶¶ 103 and 133). The Funds' claim administrator is UICI Administrators ("UICI"). UICI reimbursed Lewis Enterprises for the equipment and services it provided to the retired miners.

## **ANALYSIS**

When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005); *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000). The starting point for analyzing a complaint is Federal Rule of Civil Procedure 8(a). To comply with that Rule, a complaint need only provide a short and plain statement of the claim sufficient fairly to put the defendant on notice of the claim and its basis. *Leatherman v. Tarrant Co. Narcotics Intelligence &*

6

*Coordination Unit*, 507 U.S. 163, 168 (1993); *Brown*, 398 F.3d at 908; *see also* Fed. R. Civ. P. 8(a). Given the liberal pleading system established by the Federal Rules, a court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff cannot prove his claim under any set of facts consistent with the complaint. *Brown*, 398 F.3d at 908-09; *Holman*, 211 F.3d at 405. "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Brown*, 398 F.3d at 909 (internal quotations omitted). Importantly, claims under the FCA are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005).

### A. Insufficient Particularity

In their first argument, defendants claim that Shank failed to plead the circumstances constituting fraud with the requisite particularity. *See* Fed.R.Civ.P. 9(b). Rule 9(b) requires a plaintiff to plead the misrepresentation or other action or inaction he claims was fraudulent with particularity. *Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 523 (7th Cir. 1993). To do this effectively, he must identify the person who made the misrepresentation (or other action), and its time, place, content and manner. *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992). Put another way, a plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Importantly, the particularity requirement is relaxed somewhat when a defendant's allegedly fraudulent activities are directed at one or more third parties and it has exclusive possession of the information needed to plead with particularity. *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1050-51 (7th Cir. 1998) (citing *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 353 (7th Cir.

1992)). Where a defendant is in exclusive possession of this information, a plaintiff's failure to allege the specific time or place that an alleged misrepresentation was made, or the name of the particular individual to which defendant directed the fraud is not necessarily fatal. *Id*. at 1051; *see also Lathrop v. Juneau & Associates, Inc.*, 220 F.R.D. 322, 327-28 (S.D. Ill. 2004) (noting that when "a plaintiff has restricted access to information, a court is warranted in relaxing the [particularity requirement] and awaiting the plaintiff's access to the facts."). This approach is supported by Federal Rule of Civil Procedure 11(b)(3), which allows pleadings based on evidence reasonably anticipated after further investigation or discovery. *Rotella v. Wood*, 528 U.S. 549, 560 (2000) (citing *Corley*, 142 F.3d at 1050-51).

With this in mind, the Court will turn to defendants' specific allegations. In their first argument regarding the issue of particularity, defendants claim Shank's failure to specify which fund (*i.e.*, the Combined Fund or the 1992 Fund) paid the claims for Patients 1 through 7 makes his complaint impermissibly non-specific. They maintain this is essential information without which they cannot adequately defend and respond to Shank's claims. In response, Shank points out that he included the date Patients 1 through 7 obtained service from Lewis Enterprises and the coal mine for which each Patient worked. He also notes that relevant privacy laws prohibit him from identifying these individuals by name.

The information provided in the complaint is sufficient under Rule 9(b). Including the date of service and the employer of the patients should allow defendants to identify Patients 1 through 7 in their records. Without some further specific argument by defendants, the Court will not give credence to their purported lack of sufficient information to move forward with this case. Additionally, Shank has alleged his modus operandi as an acknowledged participant in Lewis

Enterprises' fraudulent activities. His detailed recitation of his actions, taken at Lewis' direction, is a sufficient description of the manner and method of Lewis Enterprises' activities. This information sheds light on the activities of the other defendants as well. When combined with the specific information Shank provided regarding Patients 1 through 7, the Court cannot hold that he failed to plead with the requisite particularity. That he did not specify which Fund paid the claims of Patients 1 through 7 does not require dismissal here. First, there is no reason to believe this information is not readily available to defendants. Further, as will become clear below, which fund paid these claims is not especially relevant right now. Finally, the Court has every reason to believe that Shank will be able to obtain the information needed to complete his description of the fraud through discovery and that he will be able to provide more specific information to defendants in a timely manner as this case progresses.

Defendants' second argument regarding particularity arises from Shank's reference to "other retirees" in several places in the complaint. (Doc. 1 at ¶¶ 71, 97, 127). They claim this general and unsupported reference makes his complaint insufficient. Though this argument is more persuasive than the first, it shares its fate. Shank has alleged that Lewis kept a three-ring binder containing the names of a large number of retired coal miners in Southern Illinois and that Lewis Enterprises and its employees solicited business from a number of these individuals. Lewis specifically gave him a portion of this List for his use in soliciting new clients. Shank has shown that Lewis has possession (probably exclusive) of this information and that it is likely to be discoverable. Thus, Shank is likely to be able to fill in the gaps in his complaint. Surely, it is not unreasonable for Shank to believe that this information will become available during discovery. Further, given the detail with which he described the schemes conducted by Lewis Enterprises, Lewis and the other defendants will not be

prejudiced by allowing Shank to gather additional facts to support his claims.

### B.     Government Involvement

Defendants also claim Counts I, II, and III must be dismissed because Shank has failed to show sufficient government involvement to state a claim under the FCA. To state such a claim, Shank must sufficiently allege, among other things, that defendants submitted a false claim or statement to the government. *See* 31 U.S.C. §§ 3729(a)(1), (2); *Gross*, 415 F.3d at 604; *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004). None of the other elements of the claim is at issue here. As detailed above, Shank plainly alleges that Lewis Enterprises submitted false claims and statements to the government. As the Court has already determined that he has pleaded with the requisite particularity, Shank's complaint sufficiently states a claim for relief. Defendants argue, however, that Claims I, II and III must be dismissed because of the additional facts Shank has included. *See Thomson v. Washington*, 362 F.3d 969, 970 (7th Cir. 2004) ("It is of course true that if a complaint pleads facts that show that the plaintiff does not have a claim, the complaint should be dismissed without further ado.").

The parties tell the Court that the precise issue before it – whether false claims and statements submitted to benefit plans established and maintained pursuant to the Coal Act are actionable under the FCA – is a matter of first impression in the federal courts. Though this might explain defendants' failure to cite any case law in support of their arguments, it does not, of course, change the fact that they bear the burden of establishing that the Court must dismiss Shank's claims. *See Yeksigian v. Nappi*, 900 F.2d 101, 104-05 (7th Cir. 1990). Under the FCA, a claim

> includes any request or demand . . . for money . . . which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money . . . which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money . . . which is

requested or demanded.

31 U.S.C. § 3279(c).  Again, defendants seem to be at a loss here because Shank has alleged that the United States Government funds the Combined Fund through the Abandoned Mine Reclamation Fund ("AMRF"), 26 U.S.C. § 9704; 30 U.S.C. § 1232(h).  (Doc. 1 at ¶ 32).  Further, Shank alleges that both the Combined Fund and the 1992 Plan receive Medicare and Medicaid funds (50% of the Medicaid funds are provided by the federal government).  (*Id*. at ¶¶ 33-35, 43-45).  Though defendants do not deny that the federal government provides these funds, they claim certain restrictions imposed by the government keep federal funds from being used to pay for hearing aids and related services.  One argument raised by the defendants is that the government does not participate in the management of the Coal Act funds.  However, they have failed to cite any authority (statutory or otherwise) indicating why, and the extent to which, this should color the inquiry.  Though Shank similarly fails to cite authority for his riposte, he claims that the Board of Trustees that manages the Funds must gain permission from Congress to take certain actions, including those to fund the Funds. The nature of the Board of Trustees' authority is disputed, and neither side has presented a particularly convincing argument as to the scope of its authority.  As defendants bear the burden here, defendants' arguments do not support dismissal.

Similarly, defendants have failed to persuade the Court that the AMRF funds do not constitute federal funds.  Essentially, defendants claim that because the AMRF is funded, in part, by federal assessments on coal mines – under 30 U.S.C. § 1232, certain coal mining companies must pay 35 cents per ton of coal produced from surface mining and 15 cents per ton for underground mining – they do not constitute federal funds.  *See* 30 U.S.C. § 1231(b).  This argument must be rejected; for if it were not, taken to its logical conclusion, federal income taxes would not be federal funds.

11

Further, defendants do not even argue that all the money in the AMRF is private, they just say that money from the coal mines is the "primary source[]" of funding. (Doc. 34 at 12). Implicitly, then, defendants admit some portion of the funds come from the government. Defendants have failed to satisfy their burden on this issue.

As defendants point out, Medicare does not pay for hearing aids or hearing aid-related services. 42 U.S.C. § 1395y(a)(7); 42 C.F.R. 411.15(d) ("The following services are excluded from coverage . . . . Hearing aids or examination for the purpose of prescribing, fitting, or changing hearing aids."). Accordingly, they claim federal funds were not used to pay for the hearing aids and related services here. Though this argument makes logical sense, it is not sufficient to convince the Court that dismissal is appropriate now. Shank can state a claim if the United States provided "any portion of the money[.]" 31 U.S.C. § 3279(c). Even in the face of the explicit prohibition on the use of Medicare funds for hearing aids in the Code, defendants have not met their burden. Shank alleges that the payments made for services rendered by Lewis Enterprises increased the amount of money provided by the government here. Further, he suggests that Medicare funds are not segregated in the manner claimed by defendants, such that federal funds do indeed fund the provision of hearing aids to coal miners under the plans at issue here. Given the factual uncertainty surrounding the precise nature of the management of the funds at issue, dismissal is inappropriate. In addition, though Shank's complaint is not entirely clear on this point, he appears to allege that Medicaid funds are used for hearing aids as well. In any event, defendants have not addressed Medicaid funds in their brief. In sum, defendants have failed to present a convincing argument that payments from the Combined Fund and the 1992 Plan are not actionable under the FCA as a matter of law. Perhaps if defendants can show that the Medicare funds are segregated or that the restrictions on those funds

are sufficient to take them outside the purview of the FCA, the Court might be inclined to accept their argument at a subsequent stage of these proceedings. However, based on the allegations in the complaint, the Court finds that Shank has sufficiently pleaded a claim to get past a Rule 12(b)(6) motion.

## CONCLUSION

Defendants' motion (Doc. 33) is **DENIED**.

**IT IS SO ORDERED**

**Dated: May 3, 2006.**

                                                 /s/ J. Phil Gilbert  
                                                 **J. PHIL GILBERT**  
                                                 **U.S. District Judge**